**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MILADY AQUINO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 12 C 4557** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | **Judge Rebecca R. Pallmeyer** |
| **Commissioner of Social Security,[1]** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Milady Aquino seeks review of the Social Security Administration's decision to deny her application for Disability Insurance Benefits and Supplemental Security Income. After a hearing, an Administrative Law Judge ("ALJ") determined that, while Aquino has severe impairments of affective/mood disorder and hypertension, Aquino is not disabled because she still has the Residual Functional Capacity ("RFC") to perform light work. On May 23, 2012, the Appeals Council denied review, rendering the ALJ's decision the final and reviewable administrative decision of Defendant, Carolyn W. Colvin, Acting Commissioner of the Social Security Administration. In challenging the denial of benefits, Plaintiff argues that the ALJ (1) erred when he failed to find Aquino's fibromyalgia, dizziness, vertigo, and headaches to be severe impairments and (2) erred in determining Aquino's RFC in that he (a) failed to adequately address Plaintiff's fibromyalgia, (b) failed to consider all of Aquino's impairments in combination, (c) improperly discounted Aquino's testimony, and (d) improperly discredited the reports of Aquino's treating physician. The court agrees that the ALJ failed to consider Plaintiff's diagnosed fibromyalgia and failed to analyze her impairments in combination. Accordingly, the

---

[1]      On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security. Carolyn Colvin is automatically substituted as Defendant in this suit, FED. R. CIV. P. 25, and no further action is necessary to continue this suit. 42 U.S.C. § 405(g).

court grants Plaintiff's motion for summary judgment [13] and remands for further consideration.

## BACKGROUND

Plaintiff, born on March 3, 1962, was forty-five years old at the alleged onset of her disability. (Certified Copy of Admin. Record [11], hereinafter "R.," 168.) Plaintiff has only a second grade education and is Spanish speaking: she understands, reads, and writes little English. (*See* R. at 44–45, 62, 155.) Her last full-time job was as a cleaner in a muffler shop, where she worked from 1996 until the shop closed in 2007. (R. at 27–28, 157.) Plaintiff also sporadically worked as a hair dresser in 2007, but was unable to find a new full-time job. (R. at 24, 27–28.)

On December 19, 2008, Plaintiff filed an application for Supplemental Security Income, and on January 13, 2009 she filed an application for Disability Insurance Benefits. (R. at 22.) In both applications, Plaintiff alleged that she became disabled on June 30, 2007 by arthritis, depression, chronic chest pain, fibromyalgia, vertigo, an enlarged heart and other heart conditions, insomnia, anxiety, and Keratoconos. (R. at 22, 156.) The state agency denied Aquino's application on June 4, 2009, and again, after reconsideration, on January 29, 2010. Each time, the agency concluded that while the medical evidence did show "some restrictions in [Plaintiff's] ability to function," she remained capable of performing the maintenance work she had done in the past. (R. at 72–81, 84–91.) Aquino then filed a timely Request for Hearing, which was held on February 3, 2011 before ALJ Jose Anglada. (R. at 15, 39.) The ALJ issued his written decision on February 25, 2011, similarly concluding that although the medical evidence revealed some functional restrictions, Aquino retained "the residual functional capacity to perform light work." (R. at 26.) On May 23, 2012, the Appeals Council denied review of the ALJ's decision, rendering that decision final and reviewable. (R. at 1–6.). On June 12, 2012, Aquino filed this action seeking review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). (Compl. [1].)

At the hearing before ALJ Anglada, Aquino presented several categories of evidence,

which she asserts establish her disability: (1) her medical records, (2) results of consultative exams performed in connection to her disability application, and (3) her own testimony. The court reviews each category of evidence in turn.

## I.    Medical Records

Aquino alleges that she suffers from both mental and physical impairments. According to Aquino, her physical impairments include: (1) hypertension;[2] (2) fibromyalgia[3] and joint pain; (3) dizziness, vertigo, and headaches; (4) Keratoconus;[4] (3) heart palpitations and chest pain; and (6) fatigue. (Pl.'s Opening Br. in Supp. of Mot. for Summ. J. [14], hereinafter "Pl. Br.," 2.) Aquino alleges that her physical impairments are worsened by her depression and anxiety. (*Id.* at 12; R. at 704–07.)

### A.    Evidence of depression and hypertension

The parties agree that Plaintiff suffers from depression and hypertension, and the medical evidence amply supports that conclusion. Medical records reveal that Aquino's psychological problems date back to the mid-1990s. (R. at 237.) More recently, her depression was noted in her medical records in March of 2007 (R. at 351), and again in February of 2008,

---

[2]    Hypertension, or high blood pressure, is "a common condition in which the force of the blood against your artery walls is high enough that it may eventually cause health problems, such as heart disease." *Diseases and Conditions:    High Blood Pressure (Hypertension)*, Mayo Clinic (Apr. 28, 2014), www.mayoclinic.org/diseases-conditions/high-blood-pressure/basics/definition/con-20019580, last visited Dec. 8, 2014.

[3]    "Fibromyalgia is a disorder characterized by widespread musculoskeletal pain accompanied by fatigue, sleep, memory and mood issues. Researchers believe that fibromyalgia amplifies painful sensations by affecting the way your brain processes pain signals." *Diseases and Conditions: Fibromyalgia*, Mayo Clinic (Feb. 20, 2014), http://www.mayoclinic.org/diseases-conditions/fibromyalgia/basics/definition/con-20019243, last visited Dec. 8, 2014.

[4]    Keratoconus "occurs when your cornea—the clear, dome-shaped front surface of your eye—thins and gradually bulges outward into a cone shape. A cone-shaped cornea causes blurred vision and may cause sensitivity to light and glare." *Diseases and Conditions: Keratoconus*, Mayo Clinic (Feb. 20, 2013), www.mayoclinic.org/diseases-conditions/keratoconus/basics/definition/con-20024697, last visited Dec. 8, 2014.

when she was prescribed Lexapro, a selective serotonin reuptake inhibitor, to treat depression. (R. at 359.) In early 2009, Plaintiff's treating physician, Dr. Sirois, again noted that Plaintiff suffered from depression and memory loss, but noted that she appeared less anxious, indicating that the medicines were effective. (R. at 372.) There is also evidence in the record that Plaintiff suffers from hypertension (*see e.g.*, R. at 359) (Alivio Medical Center record prescribing Metoprolol[5] for high blood pressure), but as the ALJ noted, the hypertension is well controlled with medication. (R. at 351, 432, 713.)

### B.    Evidence of fibromyalgia and joint pain

The medical records support Plaintiff's assertion that she suffers from fibromyalgia and joint pain, as well. Although she apparently experienced some joint pain as early as 2005 (*see* R. at 387, 432), Plaintiff first sought treatment for her muscle and joint pain in 2008. On May 26, 2008, at an appointment with Dr. Sirois, an internist at Alivio Medical Center, Plaintiff complained of shoulder pain. (R. at 366.) By October 23, 2008, Plaintiff had been referred by her primary care physician to Dr. Fernando and Dr. Hutchinson at the University of Illinois Medical Center at Chicago for an orthopedic evaluation. (R. at 499.) Notes of that evaluation show that Plaintiff complained of pain in her neck, "thoracic posterior," both shoulders, both elbows, "bilateral humerus," hands, and forearms that had lasted for a year, but she had not previously been evaluated for it. (*Id.*) She reported that she had been able to work— presumably as a hair dresser—and had "never missed a day, but the pain is getting a little bit in

---

[5]    "Metoprolol is used alone or in combination with other medications to treat high blood pressure. It also is used to prevent angina (chest pain) and to improve survival after a heart attack. Extended-release (long-acting) metoprolol also is used in combination with other medications to treat heart failure. Metoprolol is in a class of medications called beta blockers. It works by relaxing blood vessels and slowing heart rate to improve blood flow and decrease blood pressure" *Metoprolol*, MEDLINEPLUS, (July 1, 2010) http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682864.html, last visited Dec. 15, 2014.

her way." (*Id.*)  After examining her, the doctors determined that Plaintiff should take Naproxen[6] "on a continuous basis" to relieve pain, should get physical therapy, and should have additional x-rays taken in order to rule out any neck or rheumatologic pathologies and determine whether she suffered from fibromyalgia.  (R. at 500.)  When Aquino returned on December 4, 2008, after completing the tests, Dr. Hutchinson did rule out other pathologies and assessed Plaintiff as a "female with fibromyalgia."  (R. at 668.)

On December 23, 2008, Aquino also saw Dr. Shiva Arami—a rheumatologist—for an evaluation of her neck and shoulder pain.  Dr. Arami recorded that Plaintiff had a disturbed sleep cycle associated with "tender points" that include the upper back, occipital region, and paresthesia[7] that involved the hands and had in the past involved the feet.  (R. at 677.)  She noted that Plaintiff's pain was "possibly related to myofascial pain syndrome/fibromyalgia exacerbated by her job as a hairdresser," which required her to elevate her arms for a few hours at a time.  (R. at 675–76.)  She recommended electromyography[8] testing for other neuropathic symptoms (R. at 676), which ultimately showed normal results.  (R. at 759.)  She also recommended physical therapy to strengthen Aquino's upper body, a combination of Tylenol

---

[6]    "Naproxen is used to relieve pain from various conditions such as headaches, muscle aches, tendonitis, dental pain, and menstrual cramps.  It also reduces pain, swelling, and joint stiffness caused by arthritis . . .  It works by blocking your body's production of certain natural substances that cause inflammation."  *Drugs & Medications: Naproxen Oral*, WEBMD, (no date given) http://www.webmd.com/drugs/2/drug-5173-1289/naproxen-oral/naproxen-oral/details, last visited Dec. 8, 2014.

[7]    Paresthesia is "a sensation of prickling, tingling, or creeping on the skin having no objective cause and usually associated with injury or irritation of a sensory nerve or nerve root."  *Paresthesia*, MERRIAM-WEBSTER.COM, (no date given) www.merriam-webster.com/ medical/ paresthesia, last visited Dec. 8, 2014.

[8]    "Electromyography (EMG) is a diagnostic procedure to assess the health of muscles and the nerve cells that control them (motor neurons) . . . EMG results can reveal nerve dysfunction, muscle dysfunction or problems with nerve-to-muscle signal transmission."  *Tests and Procedures: Electromyography (EMG)*, MAYO CLINIC, (Oct. 25, 2012) http://www. mayoclinic.org/tests-procedures/electroconvulsive-therapy/basics/definition/prc-20014183,  last visited Dec. 15, 2015.

and Naproxen for pain, and Nortriptyline[9] to help her sleep.  (R. at 676.)

At the direction of Drs. Hutchinson and Arami, Aquino visited a physical therapist in March 2009 for the pain in her neck, back, and both shoulders.  (R. at 720–23.)  On March 10, 2009, physical therapist Stephen Shaffer recorded that Plaintiff felt "pain in her neck, back, and both upper extremities," and that the problem had begun twenty years earlier. (R. at 720.)  Shaffer's notes show that Plaintiff reported she had not received treatment in the past because her (unidentified) previous primary care physician believed her pain was associated with her depression.  (*Id.*) Plaintiff described her pain as "heavy and pulsating."  (*Id.*)  She stated that she had not worked in seven months, though she had previously worked cleaning and cutting hair.  (R. at 721.)  Shaffer noted that Plaintiff's symptoms might be consistent with "chronic cervical/thoracic dysfunction."  (R. at 722.)  Shaffer identified three separate pathologies: "cervical, thoracic, and UE [upper extremities]," and concluded that Plaintiff's rehabilitation potential was "good."  (*Id.*)  At a follow-up visit on March 18, 2009, Shaffer recorded that Plaintiff was tolerating treatment "well," but opined that her "usage of the pain scale may be scewed [sic]" (he did not say in which direction).  (R. at 732.)

Dr. Janet Leon, a doctor associated with Dr. Arami, saw Plaintiff on March 31, 2009. Dr. Leon noted that Plaintiff's dispersed myalgia[10] had improved, but that Plaintiff continued to experience soft tissue pain over her shoulders and neck.  (R. at 733.)  Dr. Leon observed that the pain is "possibly related to myofascial pain syndrome/fibromyalgia" and that it was "likely exacerbated by her job as a hairdresser." (R. at 734.)  Dr. Leon increased Plaintiff's prescription

---

[9]     "Nortriptyline is used to treat depression. Nortriptyline is in a group of medications called tricyclic antidepressants. It works by increasing the amounts of certain natural substances in the brain that are needed to maintain mental balance." *Nortriptyline*, MEDLINEPLUS, (Feb. 15, 2013) http://www.nlm.nih.gov/medlineplus/druginfo/meds /a682620. html#why, last visited on Dec. 9, 2014.

[10]     Myalgia is defined as pain in one or more muscles.  *Myalgia*, MERRIAM-WEBSTER.COM, (no date given), www.merriam-webster.com/medical/myalgia, last visited Dec. 8, 2014.

of Nortriptyline to help her sleep and instructed her to continue with her treatment of Naproxen and Tylenol, and physical therapy for the pain. (*Id.*) Physical therapy was partially successful: after roughly three months, on June 22, 2009, physical therapist Shaffer concluded that the therapy had addressed Plaintiff's primary complaint of neck and thoracic pain, but had not sufficiently addressed Plaintiff's shoulder pain. (R. at 727.)

### C. Evidence of dizziness, vertigo, and headaches

Aquino began experiencing dizziness, vertigo, and headaches in the late 1990s. (*See* R. at 396, 413, 417.) On June 6, 2006, Aquino was seen at Alivio Medical Center for a variety of complaints including anxiety, lack of sleep, malnutrition, pelvic pain, dizziness, and allergies. (R. at 346.) On March 20, 2007, and again on June 28, 2007, Aquino complained to her doctors at Alivio Medical Center about "dizzy spells" and vertigo. (R. at 335, 351.)

As the medical records reflect, the dizziness worsened in 2008. Aquino complained of dizziness and chest pain on January 4, 2008 to her physicians at Alivio Medical Center. (R. at 358.) On May 14, 2008 she again complained of chest pains and dizziness, which she reported had been ongoing for at least two months. (R. at 363; *see also* R. at 365 (undated medical record indicating Aquino was hospitalized for chest pain and dizziness).) Based on her complaints of vertigo and headaches, her primary care physician, Dr. Sirois, referred her for a computerized tomography ("CT") scan.[11] (R. at 510–11.) The CT scan, taken on May 31, 2008, revealed "punctate calcifications[12] within the posterior right thalamus, subcortical region of the left frontal lobe, and periphery of the mid right cerebellar hemisphere." (R. at 510.) The report

---

[11]     A computerized tomography or CT scan "combines a series of x-ray views taken from many different angles and computer processing to create cross-sectional images of the bones and soft tissues inside your body." *Tests and Procedures: CT Scan*, MAYO CLINIC, (Mar. 23, 2012), www.mayoclinic.org/tests-procedures/ct-scan/basics/definition/prc-20014610, last visited Dec. 8, 2014.

[12]     A calcification is a deposit "of lime or other insoluble calcium salts" and also refers to a "dense opacity . . . on a radiographic image." *Stedman's Medical Dictionary* 287 (28th ed. 2006). Punctate describes something "marked with points or dots differentiated from the surrounding surface by color, elevation, or texture." *Id.* at 1605.

noted that findings suggested "possible chronic intracranial infection such as neurocysticercosis."[13] (R. at 511.)

Aquino continued to complain of headaches and vertigo or dizziness from late 2008 through early 2009. Dr. Sirois recorded her complaints on August 28, 2008 (R. at 369, 450) and November 21, 2008. (R. at 370.) Her physical therapist recorded Plaintiff's complaint of dizziness and vertigo on March 10, 2009. (R. at 720.) On March 12, 2009, Aquino again complained of dizziness to her doctors at Alivio Medical Center. (R. at 790.) On March 25, 2009, Dr. Miriam Redleaf, an otolaryngologist (an ear, nose, and throat specialist) from the University of Illinois Medical Center at Chicago, noted that Plaintiff complained of a history of vertigo, with episodes occurring on a daily basis for several years. (R. at 746.) Plaintiff told Dr. Redleaf that the episodes last from a couple of seconds up to two minutes and were accompanied by nausea. (*Id.*) Dr. Redleaf noted that Plaintiff was not taking any medications, nor had she seen an otolaryngologist for the disorder. (*Id.*) Dr. Redleaf's impression was that Plaintiff's symptoms were "consistent with benign paroxysmal vertigo."[14] (R. at 747.) During a consultation for heart palpitations with Dr. Shivaraju, a cardiologist at University of Illinois at Chicago on September 14, 2009, Plaintiff again complained of daily episodes of dizziness and vertigo lasting 30 minutes, both when resting and doing work. (R. at 748.) Dr. Shivaraju noted characterized these symptoms as "BPPV" (benign paroxysmal positional vertigo). (R. at 749.)

---

[13]     Neurocysticercosis is an "infection of the central nervous system with cysticerci [larva] of the pork tapeworm." *Definition of Neurocysticercosis*, MERRIAM-WEBSTER.COM, (no date given) www.merriam-webster.com/medical/neurocysticercosis, last visited Dec. 8, 2014.

[14]     "Benign paroxysmal positional vertigo is characterized by brief episodes of mild to intense dizziness. Symptoms of benign paroxysmal positional vertigo are triggered by specific changes in the position of your head, such as tipping your head up or down, and by lying down, turning over or sitting up in bed. You may also feel out of balance when standing or walking. Although benign paroxysmal positional vertigo can be a bothersome problem, it's rarely serious except when it increases the chance of falls." *Diseases and Conditions:  Benign Paroxysmal Positional Vertigo*, MAYO CLINIC (July 10, 2012), www.mayoclinic.org/diseases-conditions/vertigo/basics/definition/con-20028216, last visited Dec. 15, 2014.

Plaintiff never received a definitive diagnosis for her dizziness and vertigo. Three months before the hearing, on November 11, 2010, Plaintiff went to St. Anthony Hospital complaining of a headache lasting several days, chest pain, fainting, and shaking episodes. (R. at 812.) Doctor Ashish Mukherjee stated that Plaintiff needed a neurological evaluation, including a possible MRI to evaluate her history of cysticercosis. (*Id.*) Again, Plaintiff had a CT head scan, which revealed no acute intracranial findings, but did show "a few small nodular calcifications along the cerebral and cerebellar cortex." (R. at 836.) Based on the results of the CT scan, Dr. Chairat Luangsuwan concluded the calcifications might be due to "old calcified granulomatas[15] or cysticercosis."[16] (*Id.*)

### D.    Evidence of heart conditions

Plaintiff has consistently reported experiencing heart palpitations and has undergone several rounds of cardiac testing. The records show that Aquino complained of heart palpitations and chest pains as early as December 19, 1997. (R. at 413.) Plaintiff complained again of chest pain, dizziness, fatigue, and arm pain that "feels like a burning sensation," on May 18, 1999. (R. at 417.)

Despite these complaints, the vast majority of the tests in the medical record reveal no

---

[15]    "Calcified granuloma: A node-like type of tissue inflammation that has a specific appearance under a microscope (granuloma) and contains calcium deposits. Because it usually takes some time for calcium to be deposited in a granuloma, it is generally assumed that a calcified granuloma is an old granuloma, or an old area of inflammation." *Definition of Calcified granuloma*, MEDICINENET.COM (Mar. 19, 2012), http://www.medicinenet.com/script/ main/art. asp?articlekey=8908, last visited Dec. 8, 2014.

[16]    "Cysticercosis is a parasitic tissue infection caused by larval cysts of the tapeworm *Taenia solium.* These larval cysts infect brain . . . and are a major cause of adult onset seizures in most low-income countries." *Parasites – Cysticercosis,* CENTERS FOR DISEASE CONTROL AND PREVENTION (April 16, 2014), http://www.cdc.gov/parasites/cysticercosis/, last visited Dec. 8, 2014. If cysts develop in the brain, the disease is called "neurocysticercosis" and can cause seizures, headaches, confusion, difficulty with balance, brain swelling, and excess fluid around the brain. *Parasites – Cysticercosis: Disease,* CENTERS FOR DISEASE CONTROL AND PREVENTION (April 14, 2014) http://www.cdc.gov/parasites/cysticercosis/disease.html, last visited Dec. 8, 2014.

abnormalities or physical problems.  The only medical record of a heart problem is a September of 2006 diagnosis of mitral valve prolapse[17] (R. at 336), though later tests showed that this condition was not a significant problem.  (*See* R. at 533–35.)  None of the other medical tests recorded any further abnormalities.  On May 12, 2006, a cardiac echo-doppler exam [18] performed by Dr. Nancy Miranda showed an "essentially normal" result reflecting "equivocal mitral valvular prolapse without significant valvular insufficiency noted."  (R. at 533–35.)  On July 27, 2006, Plaintiff tested negative for stress-induced ischemia.[19]  (R. at 340.)

On January 4, 2008, Plaintiff again complained of chest pain and dizziness, and her doctor referred her for a stress test.[20]  (R. at 358.)  The stress echocardiogram, again performed by Dr. Miranda, revealed a normal sinus rhythm.  (R. at 526.)  Though Plaintiff's blood pressure was "hypertensive" in response to exercise, Dr. Miranda nevertheless concluded that Plaintiff

---

[17]     "Mitral valve prolapse (MVP) occurs when the valve between your heart's left upper chamber (left atrium) and the lower chamber (left ventricle) doesn't close properly." *Diseases and Conditions:  Mitral Valve Prolapse*, Mayo Clinic (Apr. 5, 2014), www.mayoclinic.org/diseases-conditions/mitral-valve-prolapse/basics/definition/con-20024748, last visited Dec. 8, 2014.

[18]     An echocardiogram is "a type of ultrasound test that uses high-pitched sound waves that are sent through a device called a transducer.  The device picks up echoes of the sound waves as they bounce off the different parts of your heart.  These echoes are turned into moving pictures of your heart that can be seen on a video screen."  Specifically, a doppler echocardiogram, like the one that Plaintiff underwent, is a test used "to look at how blood flows through the heart chambers, heart valves, and blood vessels."  *Heart Disease Health Center: Echocardiogram*, WebMD (Dec. 9, 2011), www.webmd.com/heart-disease/echocardiogram, last visited Dec. 8, 2014.

[19]     "Myocardial ischemia occurs when blood flow to your heart muscle is decreased by a partial or complete blockage of your heart's arteries (coronary arteries). The decrease in blood flow reduces your heart's oxygen supply." *Diseases and Conditions: Myocardial Ischemia*, Mayo Clinic (Mar. 6, 2014) http://www.mayoclinic.org/diseases-conditions/myocardial-ischemia/basics/definition/con-20035096, last visited Dec. 8, 2014.

[20]     "A stress test, also called an exercise stress test, is used to gather information about how well your heart works during physical activity . . . An exercise stress test usually involves walking on a treadmill or riding a stationary bike while your heart rhythm, blood pressure and breathing are monitored." *Tests and Procedures: Stress Test*, Mayo Clinic (Dec. 9, 2011) http://www.mayoclinic.org/tests-procedures/stress-test/basics/definition/prc-20019801, last visited Dec. 8, 2014.

had a good exercise capacity and a low probability of new future cardiac events. (R. at 526–27.) Plaintiff complained of chest pain and palpitations again on February 15, 2008 (R. at 359) and May 14, 2008. (R. at 363.) On May 21, 2008, Plaintiff went to Mercy Hospital and Medical Center, due to chest pain and dizziness, but a chest x-ray performed the same day did not reveal any abnormalities. (R. at 611, 645.) Plaintiff was admitted to the hospital and underwent another stress echocardiogram the following day, but it again did not reveal any abnormalities. (R. at 514.) Plaintiff was then discharged with a direction to resume normal physical activities (R. at 650–51), but returned to Dr. Sirois soon afterwards complaining again of heart palpitations. (R. at 365.) Dr. Sirois performed a cardiac echo-doppler study himself on June 18, 2008, but the results were normal. (R. at 506.)

Aquino underwent more cardiac testing in 2009. On April 6, 2009, she had a complete echocardiogram at St. Anthony Hospital. (R. at 296.) The report evaluated Plaintiff's mitral and tricuspid valves.[21] The mitral valve leaflets[22] were "normal in appearance," and there was "clinically insignificant, mitral regurgitation . . . present." (R. at 692.) Aquino's tricuspid valve leaflets were also "normal (with good mobility and cooptation) in appearance," but the tests showed mild tricuspid regurgitation. (*Id.*) In June, Dr. Sirois referred Aquino for another cardiac consultation, this time with Dr. Samuel Dudley of the University of Illinois Medical Center at

---

[21] "There are four valves within your heart. They are the mitral, tricuspid, aortic and pulmonic valve. The mitral valve and tricuspid valve lie between the atria (upper heart chambers) and the ventricles (lower heart chambers)," the mitral valve separates the left heart chambers and the tricuspid valve separates the right heart chambers. *Your Heart Valves*, CLEVELAND CLINIC (no date given) http://my.clevelandclinic.org/services/heart/heart-blood-vessels/heart-valves, last visited Dec. 8, 2014.

[22] "Mitral valve leaflets, shaped like parachutes, are attached to the inner wall of the left ventricle by a series of strings called 'chordae.' When the ventricles contract, the mitral valve leaflets close snugly and prevent the backflow of blood from the left ventricle into the left atrium. When the ventricles relax, the valves open to allow oxygenated blood from the lungs to fill the left ventricle." *Mitral valve Prolapse*, MEDICINENET.COM (Aug. 5, 2014) http://www.medicinenet.com/mitral_valve_prolapse/article.htm, last visited Dec. 8, 2014.

Chicago.  (*See* R. at 751.)  Plaintiff performed a two-day Holter Study,[23] which did not record anything of significance.  (R. at 750.)  Dr. Dudley noted that Plaintiff's previous test results— normal left ventricular function, no evidence of ischemia, normal ejection fraction, normal left ventricular function with minimal mitral regurgitation and tricuspid regurgitation, and no evidence of abnormal heart beats from the Holter monitor—suggest that Plaintiff's chest pain is non-cardiac in origin.  (R. at 752.)  Despite the repeated test results, Plaintiff was still reporting palpitations on July 30, 2009 but had no diagnosis to explain them.  (R. at 797.)  Doctors did not recommend further testing at the time, but suggested continued symptom monitoring.  (R. at 750.)

### E.  Evidence of vision loss

The record does not show when Plaintiff was diagnosed with Keratoconus, but she began treatment in the mid-1990s through a study at the University of Illinois Medical Center designed to test the effects of special contact lenses in treating the condition.  (R. at 236; Pl.'s Br. at 2 n.3.)  Plaintiff continued in the University of Illinois study and progressively complained of pain in her eyes, redness, and swelling.  (R. at 307.)  By January 2, 2008, the notes from the study report that Plaintiff was "seeing less and less," as a result of Keratoconus.  (R. at 670.)

## II.  Consultative Exams

In connection with her disability application, Plaintiff underwent two consultative exams with independent clinicians: a physical exam conducted by Dr. Hilton Gordon (R. at 710), and a psychiatric exam by Dr. Gil.  (R. at 704.)  Aquino's treating physician, Dr. Evan Sirois, also submitted three reports in support of her application for disability.  The court reviews each exam in turn.

---

[23]     A Holter monitor is a small, wearable device that keeps track of one's heart rhythm and records heartbeats.  *Tests and Procedures:  Holter Monitor*, MAYO CLINIC (Apr. 9, 2014),  www.mayoclinic.org/tests-procedures/holter-monitor/basics/definition/prc-20015037,  last visited Dec. 8, 2014.

### A. Physical Exam by Dr. Gordon

On April 7, 2009, during her physical examination with Dr. Gordon, Plaintiff rated her fibromyalgia pain—in her arms, shoulders, both sides of her chest, and mid-lower back—at a seven out of ten on most days.  (R. at 710.)  Plaintiff stated that she was nevertheless able to dress, bathe, and feed herself and she was able to lift from ten to fifteen pounds.  (*Id.*)  Dr. Gordon observed that Plaintiff was "alert, oriented and in no acute distress."  (*Id.*)  Dr. Gordon also concluded that Plaintiff "can speak and hear with no problems."  (R. at 712.)  Dr. Gordon noted that Plaintiff was able to get on and off the examining table "without difficulty or assistance," albeit "slowly."  (R. at 710.)  Plaintiff had a strong grip strength that was "slightly decreased to 4-5/5," normal muscle strength, and the ability to perform fine and gross manipulation.  (*Id.*)  Moreover, Dr. Gordon noted that Plaintiff had full range of motion in her hips, knees, and ankles.  (*Id.*)  Dr. Gordon concluded that Plaintiff was able to sit, stand, walk, lift, and carry "without difficulty."  (R. at 713.)

Dr. Gordon confirmed Plaintiff's diagnosis of fibromyalgia and noted the possibility of arthritis as well.  (R. at 712.)  He observed that although she had full range of motion in all of her joints, she complained of pain in the shoulders on movement.  (*Id.*)  Dr. Gordon also confirmed Plaintiff's hypertension, but concluded the condition was stable due to her continued use of Metoprolol and absence of headache, blurred vision, kidney disease, visual disturbances, chest pain, or shortness of breath.  (R. at 710.)

### B. Psychiatric Exam by Dr. Gil

During her psychiatric examination, on April 7, 2009, Plaintiff informed Dr. Ana Gil that her depression had been ongoing for at least twenty years.  (R. at 704.)  Plaintiff explained that she had been more depressed in the recent past because she had a great deal of pain, which worsened her mood.  (R. at 704, 707.)  Aquino described crying spells, insomnia, and dizziness.  (R. at 704–05.)  Plaintiff reported she had last worked a year earlier as a housekeeper, but only for two weeks because her pain was so severe.  (R. at 705.)  Dr. Gil concluded that Plaintiff had

"mild psychomotor agitation" and a "sad, slightly tearful, restricted affect with a mildly depressed mood." (R. at 707.) Dr. Gil found no evidence that Plaintiff suffered from psychosis or a thought process disorder, however, and concluded her history of symptoms were indicative of a Dysthymic Disorder Secondary Type.[24] (*Id.*)

### C. Treating Physician Reports

Dr. Sirois, one of Plaintiff's treating physicians, completed two separate evaluations in support of Plaintiff's disability application: one on June 24, 2009 (R. at 844–47) and a second on November 9, 2010. (R. at 805–09.)[25] The reports are largely similar. Dr. Sirois recorded that he had been seeing Plaintiff since January 17, 1994 roughly every two to three months. (R. at 806.) Dr. Sirois recorded Plaintiff's chief complaints of dizziness, chest pain, palpitations, dyspnea, [26] pre-syncope, [27] syncope, [28] chronic vertigo, depression, and stress urinary

---

[24] Dysthymia is "a mild but long-term (chronic) form of depression." *Diseases and Conditions: Dysthymia*, MAYO CLINIC (Dec. 20, 2012), www.mayoclinic.org/diseases-conditions/dysthymia/basics/definition/con-20033879, last visited Dec. 8, 2014. "Secondary dysthymia develops as a consequence of a chronic disorder of a physical or psychological nature," as opposed to primary dysthymia, which "is a low-grade depression lasting more than 2 years," and typically begins in childhood or adolescence. Arun V. Ravindran & Yvon D. Lapierre, *Primary Dysthmia: Predictors of Treatment Response*, *in* DYSTHMIA AND THE SPECTRUM OF CHRONIC DEPRESSIONS 44, 44 (Hagop S. Akiskal & Giovanni B. Cassano eds., 1997).

[25] The court notes that there is a third report dated May 11, 2011 in the certified copy of the administrative record. (*See* R. at 883–86.) This report is dated after the hearing, which was on February 3, 2011, and after the decision was issued on February 25, 2011. The report is largely similar to the earlier two reports, but the court does not consider it because the ALJ did not have the third report when making his determination.

[26] Dyspnea is shortness of breath: "Although shortness of breath—known medically as dyspnea—is likely to be experienced differently by different people, it's often described as an intense tightening in the chest or feeling of suffocation." *Symptoms: Shortness of Breath–Definition*, MAYO CLINIC (Apr. 13, 2013), http://www.mayoclinic.org/symptoms/shortness-of-breath/basics/definition/sym-20050890, last visited Dec. 8, 2014.

[27] Pre-syncope is "Dizziness before fainting. Some symptoms of dizziness such as wooziness, feeling about to black out, and tunnel vision may be pre-syncopal and are due to insufficient blood flow to the brain." *Definition of Dizziness*, pre-syncopal, MEDICINENET.COM (Oct. 9, 2012) http://www.medicinenet.com/script/main/art.asp?articlekey=3089, last visited Dec. 8, 2014.

incontinence.   (R. at 806, 844.)   Dr. Sirois's notes reflect a diagnosis of "anxiety with somatization,[29] chest pain with negative eval except trace MR [mitral regurgitation]" (R. at 806, 844) and "hypertension, diastolic dysfunction,[30] chronic palpitations."   (R. at 806.)   He documented Plaintiff's complaint of dyspnea and palpitations with minimal exertion, and her assertion that palpitations increased with exertion.   (R. at 807.)   Dr. Sirois determined that Plaintiff's capacity to walk, bend, climb, push, pull, and perform daily activities was reduced by more than 50% and that she had a 20 to 50% reduced capacity to stand, stoop, turn and travel. (R. at 809, 847.)   Dr. Sirois's June 2009 report stated that Plaintiff's fine and gross manipulation capacities were reduced by 20 to 50% (R. at 847), but the November 2010 report estimated her capacities reduced by more than 50%.   (R. at 809.)   Similarly, Dr. Sirois's first report assessed Plaintiff's ability to speak as reduced by up to 20% (R. at 847), but by the second report he concluded her ability was reduced up to 50%.   (R. at 809.)   Right and left finger dexterity suffered the same decline: Dr. Sirois's first report documented that both dexterities were reduced by up to 20% (R. at 847), and in the second report he concluded that her dexterity was reduced by more than 50%.   (R at 809.)

---

[28]      "Syncope . . . is the brief loss of consciousness and posture caused by a temporary decrease in blood flow to the brain. Syncope may be associated with a sudden fall in blood pressure, a decrease in heart rate or changes in blood volume or distribution. The person usually regains consciousness and becomes alert right away, but may experience a brief period of confusion. Syncope is often the result of an underlying medical condition that could be related to your heart, nervous system or blood flow to the brain." *Syncope*, CLEVELAND CLINIC (Nov. 2012), https://my.clevelandclinic.org/services/heart/disorders/syncope, last visited Dec. 8, 2014.

[29]      "Somatization disorder is a long-term (chronic) condition in which a person has physical symptoms that involve more than one part of the body, but no physical cause can be found. The pain and other symptoms people with this disorder feel are real, and are not created or faked on purpose." *Somatization disorder*, MedlinePlus (Sept. 9, 2012), http://www.nlm.nih.gov/medlineplus/ency/article/000955.htm, last visited Dec. 9, 2014.

[30]      Diastolic heart failure occurs when the lower left chamber (left ventricle) is not able to fill properly with blood during the diastolic (filling) phase. The amount of blood pumped out to the body is less than normal. *Diastolic Heart Failure*, WebMD (Mar. 12, 2014), http://www.webmd.com/heart-disease/heart-failure/tc/diastolic-heart-failure-topic-overview,   last visited Dec. 9, 2014.

### III.    Aquino's Hearing Testimony

At the hearing before ALJ Jose Anglada, Nora Cruz represented Plaintiff.  (R. at 39.)
The cover page of the transcript states that Ms. Cruz was the "Attorney for Claimant," (*id.*), but
in her brief Plaintiff characterizes her as a "non-attorney." (Pl.'s Br. at 1.)  Plaintiff testified that
she attended school through second grade (R. at 44), and that she cannot read English at all or
read Spanish well (R. at 63.)  Aquino testified that in 2007 she was working at a muffler shop
performing general cleaning.  (R. at 46–47.)  Plaintiff stated that she had worked there for
approximately ten years, but did not find another job after the muffler shop was sold in 2007.
(R. at 47.)  She testified, further, that she became more depressed after losing her job.
(R. at 50.)

Plaintiff reported that she suffered from pain in her hands and arms.  (R. at 49.)  She
also testified that doctors determined she had an infection in her brain—referring to the findings
of possible chronic neurocysticercosis[31] on May 31, 2008, (R. at 511.)  Plaintiff stated that the
infection remained untreated, but offered inconsistent statements regarding the reasons for the
lack of treatment:  She stated that she could not get treatment because it is "very strong and I
can go crazy" (R. at 51), that "there's no treatment" available for the condition (*id.*), and that
although she has an appointment to see her physician about the infection, "I haven't had any
money to get the testing, I haven't gone."  (R. at 51–52.)  Aquino testified that she has
headaches one to two times a week, which require her to lie down for roughly thirty minutes.
(R. at 60–61.)  Plaintiff also stated that she has had episodes of headaches that last for three
days at a time roughly four times per month.  (R. at 61–62.)  Additionally, Plaintiff testified that
she has been hospitalized for chest pain and dizziness.  (R. at 50.)  Aquino confirmed that she
takes Metoprolol for her chest pain and Naproxen for her headaches.  (R. at 52, 55.)  She has

---

[31]    Neurocysticercosis is an infection of the brain from the larva of the pork
tapeworm. *See supra* notes 13 and 16.

difficulty sleeping due to her back pain (R. at 56) and lacks energy due to her medications. (R. at 53.)

Aquino testified that she lives by herself, but that her daughter buys groceries and clothes for her and drives her when she needs to leave home. (R. at 44, 53–54.) She also stated that her daughter typically prepares her lunch, but she can manage to cook rice and beans, spaghetti, or "mongo with plantains"[32] if her daughter is not around. (R. at 57–58.) Aquino also testified that she does her own laundry only if she is feeling well. (R. at 58.)

## IV.    The Administrative Law Judge's findings

ALJ Anglada concluded that Plaintiff was not under a disability from June 30, 2007 through February 25, 2011, the date of his decision. (R. at 33.) He followed the five-step process set out in Social Security regulations to determine whether the claimant is entitled to benefits. *See* 20 C.F.R. §§ 404.1520, 416.920. This analysis requires the ALJ to examine  (1) whether the claimant has engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant is automatically disabled because her severe impairment is referenced in 20 C.F.R. § 404.1520(d); (4) if not, whether she can perform her past work given her residual functioning capacity; and (5) if not, whether the claimant cannot perform any other work in the national economy, given her residual functioning capacity, age, education, and work experience. *Cerentano v. UMWA Health & Ret. Funds*, 733 F.3d 976, 980 (7th Cir. 2013); *See* 20 C.F.R. § 404.1520.

At Step One, ALJ Anglada found that Plaintiff had not engaged in substantial gainful activity since June 30, 2007, the onset date of her alleged disability. (R. at 24.) Although the ALJ acknowledged Plaintiff's sporadic work as a hairdresser, he determined that it did not

---

[32]    The court believes this is a reference to Mangú, which is "a simple dish popular in the Dominican Republic. In other countries a similar dish is made called mofongo and can be served with meat or seafood." *Dominican Mangu,* Food.com (Nov. 4, 2008) http://www.food.com/recipe/dominican-mangu-335052, last visited Dec. 15, 2014.

constitute substantial gainful activity.  (*Id.*)  At Step Two, the ALJ found that Plaintiff had two severe impairments:  affective/mood disorder and hypertension.  (*Id.*)  The ALJ determined that Plaintiff was not automatically entitled to benefits under Step Three and proceeded to determine Plaintiff's Residual Functional Capacity (RFC) for the analysis in Steps Four and Five. (R. at 25.)

The ALJ concluded that Plaintiff has the RFC to perform light work, as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b) and could perform her past relevant work as a cleaner. (R. at 26, 33.)  Specifically, the ALJ determined that Plaintiff is not suited for work that requires fine visual discrimination, as she is unable to understand, remember, and perform detailed and complex instructions.  (*Id.*)  Aquino, therefore, cannot work around dangerous or moving machinery, nor is she suited for work that requires "intense focus and concentration for extended periods of time."  (*Id.*)  Plaintiff is also not suited for work that would require her to "function in coordinated fashion with others."  (*Id.*)  Yet the ALJ concluded that Plaintiff can stand and walk for six hours of an eight-hour workday, sit for about six hours of an eight-hour workday, each with normal rest periods; and lift and carry twenty pounds occasionally and ten pounds frequently.  (R. at 26.)

In determining Plaintiff's RFC, the ALJ did consider Plaintiff's physical impairments.  He summarized Plaintiff's testimony regarding her inability to work with her current level of pain, but noted that Plaintiff had reported similar symptoms of pain in her arms and shoulders while working as a hair dresser.  (R. at 27–28.)  The ALJ also acknowledged Plaintiff's consistent complaints of chest pain and dizziness in the medical record, but observed that cardiac testing generated consistently normal results.  (R. at 28, 29.)  Plaintiff's hypertension is well-controlled with medication, he noted.  (R. at 29.)     Next, ALJ Anglada reviewed Plaintiff's history of depression and anxiety.  He noted that although the diagnosis was consistently documented in the record, Aquino had worked for several years while depressed; he noted further, that she "has responded well to medication that has allowed her to presumably function," and her

"symptoms generally improved while on medication."  (R. at 29–31.)

Finally, ALJ Anglada reviewed the evidence submitted by Aquino and her treating physician, Dr. Sirois.  In the ALJ's view, Plaintiff's statements were not completely reliable: she testified that she did not work since the alleged onset date of her disability, but had in fact worked as a hairdresser.  (R. at 31.)  He also noted that she provided inconsistent reports of her ability to perform the activities of daily living on February 15, 2009 in her report to the agency and on April 7, 2009 at the consultative exam.  (*Id.*)  Finally, the ALJ highlighted Aquino's physical therapist's observation that Aquino's use of the pain scale appeared to be skewed.[33] (*Id.*)  The ALJ similarly found Dr. Sirois's reports unreliable.   (R. at 32–33.)  He observed that Dr. Sirois's reports appear to be based largely on Plaintiff's own report and included no objective observations to support his determinations.  (R. at 32.)  Additionally, he determined that the disconnect between Dr. Sirois's report and the remainder of the medical records suggested the Dr. Sirois's analysis reflected sympathy for the Plaintiff that could undermine the reliability of his reports.  (R. at 33.)  Instead, ALJ Anglada put "significant weight" on the independent evaluation of Dr. Gordon and moderate weight on the reports of the state agency medical consultants who examined the medical record at the first stages of the disability application.  (R. at 31–32.)

## DISCUSSION

The Social Security Act authorizes deferential judicial review of the Commissioner's final decision about benefits.  42 U.S.C. § 405(g).  The court will not reweigh the evidence or substitute its own judgment for that of the ALJ.  *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).  The court considers the rationale offered by the ALJ, *see Arnett v. Astrue*, 676 F.3d 586, 591 (2012), and will uphold the Commissioner's final decision "if the ALJ applied the correct

---

[33]      It is unclear from the physical therapy notes what basis Shaffer had for reaching this conclusion.    (*See* R. at 732.)   Furthermore, Shaffer's comment is far from precise: he observed that Plaintiff "appears to benefit from [treatment] however her usage of the pain scale may be scewed [sic]" (*id.*), without specifying in which direction—it is possible that Shaffer meant that Aquino understated her pain.

legal standards and supported [his] decision with substantial evidence." *Bates v. Colvin*, 736 F.3d 1093, 1097–98 (7th Cir. 2013). In examining the ALJ's decision, the court will determine "whether it reflects a logical bridge from the evidence to the conclusion sufficient to allow . . . a reviewing court, to assess the validity of the agency's ultimate findings." *Moore*, 743 F.3d at 1121; *see Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014). Although great deference is afforded to the determination made by the ALJ, the court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The court must "conduct a critical review of the evidence before affirming the Commissioner's decision and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (internal citations and quotes omitted).

I. **Step Two analysis**

Aquino contends that the ALJ erred in failing to find her fibromyalgia, dizziness, vertigo and headaches to be severe impairments at Step Two. (Pl.'s Br. at 9.) Aquino claims that the ALJ's improper finding at Step Two resulted in an inaccurate disability determination. (*Id.* at 10.) Yet, as the Commissioner points out, the Seventh Circuit has rejected this argument. The Step Two analysis is "a threshold issue only." *Arnett*, 676 F.3d at 591. The "ALJ must continue on to the remaining steps of the evaluation process as long as there exists even one severe impairment." *Id.* The ALJ here identified two severe impairments and did continue on with the analysis. Accordingly, "any error of omission [at Step Two] was harmless." *Id.*

II. **Residual Functional Capacity ("RFC") determination**

Second, Plaintiff challenges the ALJ's conclusion that she has the RFC to perform light work. Specifically, Aquino urges that the ALJ overstated her RFC because he (1) ignored evidence regarding her fibromyalgia, (2) failed to consider all of Plaintiff's impairments in combination, (3) determined that Aquino's own testimony was not credible, and (4) discounted Dr. Sirois's medical reports. The court agrees with Plaintiff's first two objections, though it concludes that the credibility determination and evaluation of Dr. Sirois's reports were within the

ALJ's discretion.

### A.    The ALJ failed to consider Plaintiff's diagnosed fibromyalgia

An ALJ must evaluate all relevant evidence when determining an applicant's RFC, including evidence of impairments that are not severe.  20 C.F.R. § 404.1545(a); *Arnett v. Astrue*, 676 F.3d at 591.  Plaintiff contends that the ALJ failed to do so here, specifically failing to consider how her fibromyalgia impacted her ability to perform work activities.  (Pl.'s Br. at 10.) Plaintiff contends the ALJ's analysis violated Social Security Ruling 96-7p, which directs that once an underlying "impairment[] that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities."  SSR 96-7p.  When drawing conclusions, the ALJ must "explain her decision in such a way that allows [the reviewing court] to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *Murphy v. Colvin,* 759 F.3d 811, 816 (7th Cir. 2014) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011)).   An ALJ need not mention every piece of medical evidence, but cannot "ignore a line of evidence contrary to her conclusion." *Thomas v. Colvin*, 745 F.3d at 806.

There is substantial evidence that Plaintiff suffered from fibromyalgia.  Several of her treating physicians noted such a diagnosis, and Dr. Gordon, the consulting examiner, confirmed it.  Accordingly, the ALJ was required to evaluate the intensity, persistence, and limiting effects of this condition.  Yet, the RFC analysis mentions Plaintiff's fibromyalgia only twice, once when reciting the impairments Aquino claimed in her initial application (R. at 27), and a second time when the ALJ noted that Dr. Gordon had confirmed the diagnosis of fibromyalgia.  (R. at 29.) The ALJ gave Dr. Gordon's report "significant weight" (R. at 31), but failed to analyze how Plaintiff's confirmed diagnosis of fibromyalgia affected her ability to work.

The closest that the ALJ came to the required analysis of intensity, persistence, and

limiting effects is the statement that although Plaintiff testified that she "did not look for work because she had pain in her arms and hands . . . [she] reported having had those symptoms while she was working and was receiving treatment for the same."  (R. at 28.)  In fact, however, as the record shows, Plaintiff stopped working at the muffler shop in 2007, but didn't seek treatment for the fibromyalgia pain in her shoulders and neck until 2008.  The date of the onset of that pain undermines the ALJ's inference that Plaintiff could perform her past work.  The ALJ's decision also notes that in October 2008, Plaintiff reported to Dr. Hutchinson, an orthopedist, that she "never missed a day of work," referring to her work as a hair dresser.  (R. at 31, 499.)  In emphasizing this evidence of regular work attendance, the ALJ overlooked statements Plaintiff made a month later, that her work was sporadic and that she worked only a few hours at a time.  (R. at 675.)  Furthermore, records show that Dr. Arami and Dr. Leon each determined that Plaintiff's pain was likely "exacerbated by her job as a hairdresser" (R. at 675–676, 734), and worsened in 2008.  (R. at 499) (October 23, 2008 statement that Plaintiff had been experiencing the pain for roughly one year).  On April 7, 2009, Dr. Gordon, the consulting examiner, confirmed the diagnosis of fibromyalgia and also noted that Plaintiff complained of pain when moving her shoulder.  (R. at 712.)  Finally, the ALJ did not acknowledge that efforts to address Plaintiff's shoulder pain through physical therapy were unsuccessful.  (R. at 727.)

The Commissioner's only response to these concerns is that the ALJ sufficiently explained his reasons for discrediting Plaintiff's testimony about her limitations.  (Def.'s Resp. to Pl.'s Mot. for Summ. J [18], 7–10.)  As explained below, the court agrees generally with that statement.  But inconsistencies in Ms. Aquino's testimony do not justify ignoring other objective medical evidence.  The ALJ's decision failed to account for evidence that Plaintiff's confirmed diagnosis of fibromyalgia interfered with her ability to work even a few hours a day.  This is sufficient grounds for remand.  *See Thomas*, 745 F.3d at 806 (ALJ "appears to have ignored the medical evidence that supported [claimant]'s complaints of pain . . . [the ALJ] cannot ignore a line of evidence contrary to her conclusion").

**B.      The ALJ failed to analyze Plaintiff's impairments in combination.**

The ALJ's failure to assess Plaintiff's diagnosis of fibromyalgia on its own raises an additional concern:  the law requires that Plaintiff's impairments be considered in combination with one another.  *Arnett*, 676 F.3d at 592 (citing *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009)).  In this case, the ALJ did not adequately consider the effect of Plaintiff's fibromyalgia in combination with her other impairments and symptoms.   Furthermore, although the ALJ analyzed Plaintiff's symptoms of headaches, dizziness, and vertigo, he did not explain how these symptoms interacted with Plaintiff's other diagnosed conditions.  The ALJ acknowledged that Plaintiff had headaches that occur once or twice a week and require her to lie down for 30 minutes at a time.  (R. at 28.)  The ALJ concluded nevertheless that Plaintiff could work for 6 hours with "normal rest periods," without explaining what would happen if Plaintiff experienced a headache at work.  Plaintiff also complained of daily episodes of dizziness or vertigo lasting anywhere from a couple of seconds to a few minutes.  (R. at 746.)   The ALJ did note that Plaintiff was hospitalized once because she fell backwards and hit her head after a spell of dizziness and chest pain, but he discounted Plaintiff's complaints of headaches on the basis that she took just one tablet of Naproxen a day, not two as prescribed, and took no other pain medication.  (R. at 28.)   Plaintiff explained that she took just one pill because the medicine caused stomach problems.  (R. at 28, 53.)  Even assuming that the headaches, vertigo, and dizziness are less limiting than Plaintiff described, the ALJ's failure to analyze these symptoms in combination with Plaintiff's fibromyalgia, hypertension, and depression is a critical error.  "Even if each problem assessed separately were less serious than the evidence indicates, the combination of them might well be totally disabling."  *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011).  The ALJ has not explained how the proposed work limitations would accommodate the combination of Plaintiff's symptoms, including her fibromyalgia, dizziness, vertigo, headaches, vision loss, depression, and anxiety.

### C.    Credibility determination

Plaintiff's third argument is that the ALJ improperly discredited Plaintiff's testimony regarding her limitations.  Though the court has determined that reversal is appropriate, as described above, it concludes that Plaintiff's challenge to the ALJ's credibility determinations are unsupported. Those determinations are given special deference because the ALJ is in a unique position "to hear, see, and assess witnesses." *Murphy v. Colvin,* 759 F.3d 811, 815 (7th Cir. 2014); *see Beardsley v. Colvin*, 13-3609, 758 F.3d 834, 838 (7th Cir. 2014) ("ALJ's credibility assessment will stand as long as there is some support in the record.") (citation omitted.)  The court will overturn such a determination only if "it is patently wrong, which means that the decision lacks any explanation or support." *Murphy*, 759 F.3d at 816.

The ALJ adequately explained his reasons for discrediting Plaintiff's testimony.  He noted three inconsistencies that undermined her reliability:  First, he noted that she inaccurately stated that she had not worked since June 30, 2007, when the record revealed that she had worked as a hairdresser.  (R. at 31.)   Second, he identified inconsistent statements Plaintiff made regarding daily activities in her reports to the agency.  (*Id.*)  Third, he noted that Plaintiff's physical therapist suggested she might exaggerate her pain. (*Id.*)  As the ALJ observed, these inconsistencies may not stem from an intention to mislead, but they cast a shadow on Plaintiff's credibility.  (*Id.*)  Plaintiff urges that the discrepancies regarding her work history and capacity to perform daily activities are "minor" and likely a product of testifying through an interpreter.  (Pl.'s Br. at 13.)  Because these discrepancies go to the heart of the disability determination, however, they are directly relevant to whether Plaintiff is capable of working within the restrictions imposed by her impairments and pain.   In any event, Plaintiff's position essentially asks this court to re-weigh the evidence or substitute its own judgment of Plaintiff's credibility, which the court is not permitted do.  *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).

As Plaintiff notes, the Seventh Circuit has remanded disability determinations where the ALJ failed to explain why the claimant was not credible, (Pl.'s Br. at 13–14), but these cases are

distinguishable.[34]   In *Martinez v. Astrue*, the court criticized the ALJ because there "is no explanation of which of [claimant]'s statements are not entirely credible or how credible or noncredible any of them are."  630 F.3d 693, 696 (7th Cir. 2011).  Here, the ALJ noted precisely which statements were not credible, identified evidence that contradicted the statements, and explained why they were not credible, providing a "logical bridge" between the evidence and the ALJ's conclusion.  Next, Plaintiff cites *Carradine v. Barnhart* for the proposition that "once the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence."  360 F.3d 751, 753 (7th Cir. 2004).  Again, this case differs.  The ALJ discounted Plaintiff's statements, not because they lacked objective support, but rather because her statements at the hearing appeared to be inconsistent with her past statements to the agency and her treating physicians.  *Carradine* itself confirms that "[a]ppellate review of credibility determinations, especially when made by specialists such as the administrative law judges of the Social Security Administration, is highly limited," precisely because those judges have direct access to the witness.  *Id.*  Accordingly, though reasonable minds could differ, the ALJ was not "patently wrong" to discredit Plaintiff's assertions, and the credibility determination withstands this court's deferential view.

> **D.  ALJ's evaluation of treating physician's opinions**

Finally, Aquino argues that the ALJ improperly discredited the three medical reports submitted by her treating physician, Dr. Sirois.  (Pl.'s Br. at 14.)  In general, an ALJ must consider "all of the evidence and explain the reasoning behind the decision to credit some evidence over the contrary evidence, such that [the court] could understand the ALJ's logical bridge between the evidence and the conclusion."  *Moore*, 743 F.3d at 1124.  Specifically, a

---

[34]   Plaintiff cites also to *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005), but that case addresses how an ALJ weighs evidence on the whole, rather than addressing the specific question of an adverse credibility determination.

treating physician's opinion is given controlling weight, "so long as it is supported by objective medical evidence and is consistent with other substantial evidence in the record." *Luster v. Astrue*, 358 F. App'x 738, 740 (7th Cir. 2010); *see* 20 C.F.R. § 404.1527(d)(2). The ALJ may nevertheless "reject a treating physician's opinion in the absence of such objective evidence or if substantial evidence in the record contradicts the physician's findings." *Luster*, 358 F. App'x at 740.

The court is satisfied by this aspect of the ALJs decision. Dr. Sirois submitted two[35] reports that described dramatic limitations in Plaintiff's capacity. The ALJ found those reports unreliable because Dr. Sirois "apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported." (R. at 32.) The ALJ's conclusion that Plaintiff herself was not entirely credible thus undermined Dr. Sirois's report as well.

As the ALJ also observed, Dr. Sirois's reports contrasted with much of the evidence in the record. (R. at 33.) Furthermore, Dr. Sirois's very own treatment notes did not identify physical limitations that would support his opinions. (R. at 32.) For example, no abnormal findings in Dr. Sirois's notes support his determination that Plaintiff has a significantly reduced capacity to walk, bend, stand, stoop, sit, turn, climb, push, pull, and travel. (*Id.*) Finally, as Dr. Sirois is an internist, not a psychiatrist, the ALJ gave less weight to his opinions regarding her mental capacity. (*Id.*); *see White v. Barnhart*, 415 F.3d 654, 658-59 (7th Cir. 2005) ("Indeed, it is difficult to think of more appropriate factors than a physician's specialty and familiarity with the patient . . . when determining how much weight to assign to his opinions. The practice finds support in both Supreme Court case law and the applicable regulations") (citing *Black & Decker*,

---

[35]     Dr. Sirois submitted a third report on May 11, 2011 after the hearing and the decision, which were both in February 2011. (*See supra* note 25.) The third report stated that every single one of Plaintiff's capacities listed on the form was reduced by more than fifty percent. (R. at 886.)

538 U.S. 822, 832 (2003); 20 C.F.R. §§ 404.1527(d)(2)(i) and (d)(5)).  The ALJ was within his discretion to discredit Dr. Sirois's opinion.

## CONCLUSION

The ALJ did not sufficiently analyze Plaintiff's confirmed diagnosis of fibromyalgia, nor analyze Plaintiff's symptoms of dizziness, vertigo, and headaches, in combination with Plaintiff's other confirmed impairments.  Plaintiff's remaining arguments—that the ALJ erred in discounting Plaintiff's testimony and the report of her treating physician—essentially urge the court to reweigh the evidence.   Although reasonable minds could differ regarding the credibility of Plaintiff's testimony and the reliability of Dr. Sirois's reports, the ALJ's decision on those counts, withstands this court's deferential review.   Plaintiff's motion for summary judgment [13] is granted.   The Commissioner's decision is reversed pursuant to sentence four of 42 U.S.C. § 405(g), because of the error in the Commissioner's decision, *see DeGrazio v. Colvin,* 558 F. App'x 649, 650-51 (7th Cir. 2014) (A sentence-four remand "depends on a finding of error in the Commissioner's decision") *(quoting Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan,* 195 F.3d 975, 978 (7th Cir. 1999)), and this action is remanded for further proceedings consistent with this memorandum opinion and order.

ENTER:

Dated:  December 16, 2014

_____
REBECCA R. PALLMEYER
United States District Judge